1
2
3
4
5
6
7                              UNITED STATES DISTRICT COURT

8                      FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   LONNIE LEE POSLOF, JR.,                    Case No.   1:21-cv-00339-JLT-HBK (HC)

11                    Petitioner,               FINDINGS AND RECOMMENDATIONS TO
                                                DENY PETITIONER'S PETITION AND
12          v.                                  DECLINE TO ISSUE A CERTIFICATE OF
                                                APPEALABILITY [1]
13   M. ATTCHLEY,
                                                FOURTEEN-DAY OBJECTION PERIOD
14                    Respondent.

15

16

17      I.      STATUS

18          Petitioner Lonnie Lee Poslof, Jr. ("Petitioner" or "Poslof"), a state prisoner, is proceeding

19   pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on February 5,

20   2021.  (Doc. No. 1, "Petition").  The Petition challenges Petitioner's judgment of conviction

21   entered by the Merced County Superior Court (case no. CRM028634) after a jury trial for oral

22   copulation with a minor (count 1) and lewd act on a child (count 2) for which Petitioner was

23   sentenced to a twelve-year determinate sentence (count 2) and consecutive indeterminate 15 year

24   to life sentence (count 1).  (*Id*. at 1).[2]

25          The Petition advances the following (restated) grounds for relief:

26   _____

27   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
     (E.D. Cal. 2022).
28   [2] All citations to the pleadings and record are to the page number as it appears on the Case Management
     and Electronic Case Filing ("CM/ECF") system.

                                              1

(1) Petitioner's Sixth Amendment right to meaningfully confront and cross- examine the child victim was violated because the victim refused to answer questions, was not visible to the jury, and was coached during her testimony by the support person;

(2) Petitioner's Fourteenth Due Process rights were violated by the support person's verbal encouragement and providing the child victim with a script;

(3) The trial court erred in admitting the child-victim's statements to statements to Detective Rios and her mother;

(4) The trial court erred in admitting evidence of Petitioner's "plot" to commit arson and murder witnesses;

(5) The trial court erred by imposing court facilities and operations assessment and restitution;

(6) A split of authority between the California Courts of Appeals as to whether an objection is required to preserve a claim warrants habeas relief;

(7) Petitioner was prejudiced by his absence at the restitution hearing.

(*See generally* Doc. No. 1). Respondent filed an Answer (Doc. No. 20) and lodged the state court record in support (Doc. No. 21, 21-1 through 21-31). Petitioner filed a Reply to the Answer. (Doc. No. 23). This matter is deemed submitted on the record before the Court. After careful review of the record and applicable law, the undersigned recommends the district court deny Petitioner relief on his Petition and decline to issue a certificate of appealability.

## II.    GOVERNING LEGAL PRINCIPLES

### A.    Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.* Here, the state courts adjudicated each of Petitioner's claims on the merits. This Court finds that the pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary hearing is required. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

////

2

1    **B. AEDPA General Principles**

2    A federal court's statutory authority to issue habeas corpus relief for persons in state

3    custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

4    Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

5    first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

6    the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

7    of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

8    the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v.*

9    *Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits

10   relief on a claim adjudicated on the merits, but only if the adjudication:

11
12
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

13
14
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

15   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

16   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

17   "Clearly established federal law" consists of the governing legal principles in the

18   decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

19   U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

20   unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

21   to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

22   governing law set forth by Supreme Court case law; or (2) reached a different result from the

23   Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

24   12, 16 (2003).

25   A state court decision involves an "unreasonable application" of the Supreme Court's

26   precedents if the state court correctly identifies the governing legal principle, but applies it to the

27   facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

28   133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

3

1    [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

2    extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,

3    407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas

4    relief so long as fair-minded jurists could disagree on the correctness of the state court's

5    decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the

6    state court decision "was so lacking in justification that there was an error well understood and

7    comprehended in existing law beyond any possibility for fair-minded disagreement." *Id*. at 103.

8        When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

9    State court shall be presumed to be correct [,]" and the petitioner bears "the burden of rebutting

10   the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Burt

11   v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

12   merely because the federal habeas court would have reached a different conclusion in the first

13   instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

14       Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

15   constitutional error had a "substantial and injurious effect or influence" on the verdict.  *Brecht v.

16   Abrahamson*, 507 U.S. 619, 637 (1993).  As the Supreme Court recently explained, while the

17   passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't

18   eliminate *Brecht's* actual-prejudice requirement.  *Brown v. Davenport*, ⸺ U.S. ⸺, 142 S. Ct.

19   1510, 1524, 212 L.Ed.2d 463 (2022).  In other words, a habeas petitioner must satisfy *Brecht*,

20   even if AEDPA applies.  *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether

21   or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S. 112, 121, 127 S.Ct. 2321, 168 L.Ed.2d

22   16 (2007)).  In short, a "federal court must deny relief to a state habeas petitioner who fails to

23   satisfy either [*Brecht*] or AEDPA.  But to grant relief, a court must find that the petition has

24   cleared both tests." *Id*. at 1524.

25       As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

26   an "adjudication on the merits" in state court.  An adjudication on the merits does not require that

27   there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S.

28   at 98.  "When a federal claim has been presented to a state court and the state court has denied

4

relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

## III.   RELEVANT FACTUAL BACKGROUND

Petitioner was arrested approximately one year after his then-girlfriend reported to police that he had molested her four-year-old daughter, A.J. A jury convicted Petitioner of one count of engaging in oral copulation or sexual penetration with a child 10 years old or younger (Pen. Code, § 288.7, subd. (b)) (Count 1); two counts of committing a lewd or lascivious act on a child under the age of 14 (§ 288, subd. (a)) (Counts 2 & 3); and one count of engaging in oral copulation with a child under the age of 14 (former § 288a, subd. (c)(1))[3] (Count 4). Petitioner was sentenced to the upper term of eight years on Count 2, a consecutive two-year term on Count 3 and a

---

[3] Section 288a was renumbered to section 287 effective January 1, 2019. (Stats. 2018, ch. 423, § 49, pp. 88–91.) Former section 288a, subdivision (c)(1), is now section 287, subdivision (c)(1).

1    consecutive two-year term on Count 4, for a total determinate term of 12 years.  Petitioner was

2    sentenced to a consecutive indeterminate term of 15 years to life on Count 1.

3         The Court adopts the pertinent facts concerning the underlying offenses, as summarized

4    by the California Fifth District Court of Appeal on direct appeal.  (Doc. No. 21-19).  A

5    presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v.*

6    *Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

7    **FACTUAL SUMMARY**

8    I. Prosecution Case

9    A. Facts Leading to Police Report

10   Shortly after A.J. turned four years old, the friendship between
     defendant and her mother, B.L., became romantic. About four
11   months later, in April 2013, defendant moved into the house B.L.
     shared with her four children, A.J., A.J.'s two older brothers, and
12   A.J.'s younger brother. A.J. had a very close relationship with her
     paternal grandmother, R.J., who lived several blocks away, and A.J.
13   usually spent the night at R.J.'s house. R.J. was also close with
     B.L., her former daughter-in-law.
14

15   On June 3, 2013, B.L. received a private message through
     Facebook from defendant's ex-wife, S., warning her "as a mother"
16   that defendant had abused S.'s son and had also abused another ex-
     wife's three children. B.L. did not believe the accusations and felt
17   the message was threatening because S. said that if B.L. was in a
     relationship with defendant and something happened to her
18   children, they would be taken away from her. B.L. responded that
     she did not believe S. and would have to call somebody if S.
19   continued to threaten her. B.L. asked defendant about the message
     and he said S. was just trying to start trouble.

20   Although B.L. believed defendant and did not think anything of the
     message, she mentioned it to R.J. and she called Child Protective
21   Services (CPS) to ask if she could lose her children. CPS did not
     provide her with any information, but shortly thereafter, someone
22   from CPS came to her house and spoke with her four children.

23   On June 11, 2013, R.J. was bathing A.J. and her younger brother,
     L.J., in the tub when L.J. reached for A.J.'s "business," which is the
24   term the family used for private parts. R.J. told him, " 'Hey, that's
     Sister's business, not yours[.]' " A.J. responded, " 'But Grandma,
25   Lee's business is my business.' "[1] R.J. testified that A.J.'s
     statement did not really register with her initially and she said, "
26   'No.' " A.J. then stated, " 'Yeah, but we can't tell anybody because
     I'll get in big trouble[,]' " and " 'We can't because I'll get in big,
27   big trouble.' " A.J. then told R.J that defendant put candy on his
     "business" and she licked it off.

28

[Fn1] The family referred to defendant by his middle name, Lee. (Footnote in original.)

R.J. testified that A.J. was afraid and she kept saying she would get in big trouble, defendant would tear down the clubhouse he built, and her parents would not like her anymore. A.J. told R.J. that the candy came from defendant's pocket and that he would take her to the basement of their house. R.J. reassured A.J. she would not get in trouble, but A.J. said, " 'Make sure you don't tell.' " At A.J.'s request, R.J. "pinky promise[d]" that she would not tell.

R.J. "was in a fog" and texted B.L. to tell her that L.J. wanted to spend the night, although he did not. It was too late, however, and defendant was already in the driveway to pick up L.J. A.J. hid behind the door and kept shaking her head and saying, " "Don't tell, Grandma. Don't tell[.]' " After L.J. left with defendant, R.J. texted B.L. to ensure that defendant took L.J. straight home. She described everything as a blur and after A.J. went to sleep that night, she called CPS for guidance.

In the morning, R.J. called in sick to work and took A.J. home after defendant left for work. R.J. told B.L. that A.J. said defendant was doing things to her. B.L. then spoke with A.J., who did not want to repeat what she told R.J. because she did not want to get in trouble. After B.L. reassured A.J. that she was not in trouble and "pinky promised" her that B.L. would not tell, A.J. said that defendant was putting candy on her " 'business[ ]' " and on his " 'business,' " and they were licking it off each other.

After that, R.J. left with the children and B.L. called the police. While the police were at the house, defendant drove up and parked. He asked B.L. why the police were there and after she told him she was making a report, the nature of which she did not disclose, he became angry and drove away. B.L. did not see defendant after that, although he texted her that day. At Detective Rios's direction, she responded and told him about A.J.'s allegations. Law enforcement subsequently attempted to locate defendant, but he was not arrested until approximately one year later based on a tip.

B. A.J.'s Interviews

After B.L. contacted police, A.J. had three MDIC (Multi-Disciplinary Interview Center) interviews within an approximately two-week period in June 2013. The first two interviews were conducted by a CPS social worker. Detective Rios described A.J.'s demeanor during the first interview as that of a happy, normal little girl until the questions shifted to defendant, at which point A.J. shut down, hid her face in her hands and repeated that she did not want to talk about it. During the second interview, A.J. was not enthusiastic, but "[s]he was okay" until asked what she told her grandmother, at which point she again covered her face, shook her head and said, " 'I can't do it[.]' " Both interviews were terminated when A.J. shut down. Detective Rios recommended that A.J. begin counseling, told B.L. and R.J. not to ask A.J. any questions, and told them to contact her whenever A.J. was ready to talk.

Approximately one week after the second interview, the family contacted Detective Rios and she set up a third interview, which she conducted. During this interview, A.J. asked if Rios was going to take defendant to jail because "he did it to down here" and she pointed downward. She also said Lee touched her there. She pointed to their private parts on diagrams provided by Rios and said "[h]e did it inside it," and under her shorts and "chonies." She stated that he "hid" candy on his "business" and later that he put candy from a bottle "[o]n his business" and had her lick it off. She described the candy as red and said it came from a "little tiny bottle" kept "behind" her mother's dresser where she could not see it.

## C. Dress

Shortly after A.J.'s third interview, B.L. was cleaning defendant's things out of a cabinet in the basement when she found a dress of A.J.'s behind a box of items belonging to defendant. The dress was covered in dried liquid. Detective Rios collected the dress and also collected some bottles of flavored lubricant B.L. kept on her dresser in a picture box, one of which was red and had obviously been used. Three spots on the dress were analyzed and determined to be semen that matched defendant's DNA profile.[2]

> [Fn2] The prosecution's DNA expert testified that the DNA profile obtained from the dress "is estimated to occur at random among other unrelated individuals in approximately 1 in 88 quintillion Caucasians, 1 in 980 quintillion Hispanics, . . . , and 1 in 56 quintillion African-Americans." (Footnote in original.)

## D. A.J.'s Trial Testimony

A.J. was eight years old when she testified at trial and she did not recall very many details. She testified that she did not like defendant when he lived with them and that she spent time with him in the basement. After three breaks in her testimony, the latter two at her request, A.J. testified that defendant took her into the basement and was "bad" to her, and he touched her " 'business' " with his " 'business.' " She said it was a long time ago and she "might not remember most of the questions[,]" but she talked to her mother and grandmother about it and she told them the truth. She did not recall talking to Detective Rios about it, but said her memory was better at age four than at trial. She also did not recall any candy or red liquid, and said defendant did not make her lick his " 'business.' " However, she testified he touched her with his business "a lot."

## E. Letter and Recorded Jail Calls

On July 3, 2014, approximately one year after B.L. reported A.J.'s allegations of abuse, defendant was arrested and detained at the Merced County Jail. On May 27, 2016, defendant spoke with his brother, J.P., from the jail. During the recorded call, defendant

8

asked his brother if he remembered the house defendant used to live in by the cigarette store.[3] His brother said yes and defendant asked him to find out if "those people still live there[.]" Defendant said he needed to know if "they're physically there. There's a reason for it, trust me. Ok? I—I found another alt- avenue on this issue." As the call ended, defendant said, "Um, we got until—we got until, uh, next month to do this, in time, ok but— [¶] Let— please, I'm begging you because I got people[.]" After his brother said he would, defendant said, "OK, because there's going to be some people doing—doing some stuff for me, ok? [¶] ... [¶] I need to get out."

> [Fn3] Defendant's mother testified that the house defendant and B.L. lived in together was down the street from a cigarette store. (Footnote in original.)

On June 6, 2016, an inmate being processed for release from the jail handed Officer Lacey a sealed letter, which caught Lacey's attention because outgoing letters must be scanned by staff and therefore are usually unsealed. Lacey was busy at the time so he left the letter in the control room. Defendant later contacted the control room through an intercom and asked for the letter back. Defendant subsequently asked for the letter back a second time.

The letter, dated May 28, 2016, read:

> " 'Urgent. Read and burn. J[.P.]' . . . 'this letter has been secured and mailed from the house. Now I can speak freely. I'm not going to ask you to get involved in anything that would get you into trouble with the law. Issue at hand. I need to know if B[.L.] and her kids still live at the house on East 18th, 146 East 18th. Please understand that I'm having some dangerous people handle it' '. . . and I need to know for 100 percent that they are there. If so, please say in my voicemail the following code, "The snake has made its nest." ' . . . [¶] 'Furthermore, once the place has been burned and article in Sun-Star online' . . . 'it says "no survivors. Please, J[.P.], understand that this was my last resort and only possible way for me to end this malicious prosecution. I will not tell you who's doing this for me, but understand that it's for real. Once you notify me telling me that they are still there, you'll know for a fact once the job has been done. . . . '[I]t will be big news probably on the news. J[.P.], once I get out of here, you and I will get more'— 'we'll move away from this crazy [town] . . . . After you read this letter, please burn. Destroy any remains to protect you and me. With all my respect and love, your brother Lee.' "[4]

> [Fn4] The jury saw the letter, but it was read into the record by Officer Lacey. B.L. testified that the address where she lived with defendant and her children in 2013 was 146 West 18th Street. (Footnote in original.)

On June 28, 2016, defendant again spoke with his brother, J.P., from the jail. During the recorded call, they discussed J.P.'s impending homelessness, that defendant's calls were being blocked inside the jail, and how defendant would be able to reach him. J.P. indicated he would "get an Obama phone," but it would take some time. Defendant said, "I'm trying to get out there quicker, I got somebody taking care of things, I just gotta, you know what I mean? I gotta keep my communication open otherwise I can't work things the way it's supposed to go down." He also said, "This person's- the person I'm talking about is going to be coming to you. I got a letter for you. It's very important." J.P. said he planned to leave Merced after taking care of some things and defendant asked if J.P could wait for him, stating he would be out no later than September 2016 because his trial date was September 13, 2016. He then said, "I need to get this phone thing up because I don't have a way to talk to people that are important[,]" and "I'll try to call this number again on Friday- or Thursday or Friday, and hopefully you'll have it in my voicemail, and if you can get another one[.]"

Two other recorded telephone calls from the jail were introduced into evidence. On November 29, 2016, defendant had a conversation with an unidentified woman and told her "they" were trying to get him for "[c]onspiracy to commit murder[ ]" of "[t]he whole family" over "a letter [he] wrote, that never got out."[5] Approximately 30 minutes later, he had a conversation with an unidentified man who stated, "And I hear, I hear this conspiracy thing. I mean, I talked to high end[.]" Defendant replied, "I'll tell you. I'll tell you what it's about. Okay. Listen. I'm not denying I wrote a letter. It was intercepted. Okay. It had a threat in it."

> [Fn5] The September trial date was continued to November 6, 2016, but opening statements and the presentation of evidence did not begin until December 1, 2016. (Footnote in original.)

II. Defense Case

Dr. Jessen, a forensic nurse practitioner and Ph.D., examined A.J. on July 3, 2013. She did not find any forensic evidence during the physical examination. On cross examination, she explained that she did not find any lacerations, bruises, or healed injuries, a finding which was consistent with the reported history. On redirect examination, she stated that her findings were consistent with both an assault and the absence of an assault, and she could neither confirm nor deny that sexual abuse occurred.

Defendant's mother testified that she visited defendant and B.L. numerous times at their house. The interactions she saw between the two were positive and the children seemed happy around defendant. During one visit, B.L. stated she did not like defendant's exes because they lied and told stories about him. However, she also stated that she treated defendant too well and "she wanted to have a better bad story about him." B.L. was not laughing at the time and defendant's mother thought it was "a sick joke[ ]" and said, You're not serious[.]' " B.L. replied, " 'Well, you'll see.' "

10

Defendant's mother said defendant was present for the conversation and heard everything B.L. said. When his mother asked him what was going on, he said he did not know.

III. Rebuttal

On rebuttal, Detective Rios testified that when she interrogated defendant on July 3, 2014, following his arrest, he did not mention any conversation like that described by his mother during her testimony. In addition, the prosecutor played a recorded conversation from June 12, 2013, in which Officer Garcia asked defendant over the phone what B.L. would gain from calling the police and making something like this up. Defendant replied, "I'm not saying B[.L.]'s making this up."

(Doc. No. 21-19 at 3-10).

## IV. DISCUSSION

### A. Grounds 1 and 2:  Confrontation and Coaching Claims

In his first ground for relief, Petitioner argues his Sixth right to meaningfully confront and cross-examine the child victim was violated because when the child victim testified, she was not visible on the screen, she failed to answer some questions, and the jury was unable to observe that the victim's support person was in the room with her.  Petitioner also claims his Fourteenth Amendment rights were violated because the support person influenced the child victim's testimony.  (Doc. No. 1 at 24-29).  Petitioner raised these claims on direct appeal.  (Doc. No. 21-14 at 24-40).  The Fifth Appellate District Court denied these grounds on the merits.  (Doc. No. 21-19 at 11-18).[4]  The California Supreme Court summarily denied any relief.  (Doc. No. 21-24). Respondent argues the state court's opinion rejecting these claims was not contrary to or an unreasonable application of clearly established Supreme Court precedent.  (Doc. No. 20 at 20, 27).  The Court looks through to the last state court reasoned decision in evaluating Petitioner's claims under the deferential standard of review.  *Wilson v. Sellers*, 138 S. Ct. at 1192.

### 1.  State Court Decision

I. Constitutional Challenge to A.J.'s Testimony

---

[4] A.J. testified via closed-circuit television pursuant to California Evidence Code section 1347. In compliance with section 1347, a video recording was made of A.J. during her testimony, her support person, and the attorneys. These three recordings were lodged with the California Court of Appeal, and incorporated as part of the appellate record, as Court Exhibits 1-3 (DVDs).

11

A. Background

Following hearing testimony by A.J.'s mother and Shaula Brent, a licensed clinical social worker and A.J.'s counselor, the trial court found, over defendant's objection, that A.J. would suffer severe emotional distress if required to testify in the courtroom in defendant's presence, and the court granted the prosecutor's section 1347 motion to allow A.J. to testify from another room via two-way, closed-circuit television. After A.J. testified at trial, the prosecutor moved to admit A.J.'s statement to Detective Rios pursuant to Evidence Code section 1360. Defense counsel objected and argued that A.J. was not a competent witness, citing the breaks in her testimony and her inability to answer questions or elaborate in her answers. (Evid. Code, § 1360, subd. (a)(3)(A).)

Defendant does not challenge the trial court's decision to permit A.J. to testify via closed-circuit television or renew his argument that A.J. was not competent to testify at trial, but he claims that his Sixth Amendment right to confront and meaningfully cross-examine A.J. was violated because she failed to provide verbal responses to some questions; she failed to respond to other questions; at times her face was not visible in the camera; and unbeknownst to trial counsel, she was coached by Brent. (§§ 868.5, subd. (a), 1347, subd. (f).) Defendant also claims that Brent's coaching violated his right to due process and a fair trial. The People argue that "because A.J. was present to give testimony, she was under oath, she was cross-examined, and the jury observed her demeanor as she gave testimony[,]" the confrontation clause was satisfied, and that defendant received a fair trial. We agree with the People that there was no constitutional error.

B. Confrontation Clause Claim

1. Legal Standard

"The Confrontation Clause of the Sixth Amendment gives the accused the right 'to be confronted with the witnesses against him.'" (*United States v. Owens* (1988) 484 U.S. 554, 557 (*Owens*); accord, *Maryland v. Craig* (1990) 497 U.S. 836, 844.) "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Maryland v. Craig*, *supra*, at p. 845.)

"[T]he right guaranteed by the Confrontation Clause includes not only a 'personal examination,' [citation], but also '(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.'" (*Maryland v. Craig*, *supra*, 497 U.S. at pp. 845–846, quoting *California v. Green* (1970) 399 U.S. 149, 158, fn.

omitted.) "The combined effect of these elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier of fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." (*Maryland v. Craig*, *supra*, at p. 846; accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1268.)

We review defendant's confrontation clause claim de novo. (*People v. Hopson* (2017) 3 Cal.5th 424, 431; *People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964 (*Giron-Chamul*).)

2. Analysis

a. A.J.'s Responses and Visibility on Camera

"'[T]he Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."'" (*Owens*, *supra*, 484 U.S. p. 559; *People v. Gonzales*, *supra*, 54 Cal.4th at p. 1265.) We have reviewed A.J.'s videotaped testimony and we are unpersuaded by defendant's characterization of that testimony.

A.J. was clearly uncomfortable when the prosecutor and defense counsel broached the subject of her molestation; her demeanor became somber and at times she visibly shrank down in her seat. Several of her responses were nonverbal in that she shook her head or shrugged her shoulders, but even adult witnesses at times forget to answer audibly and it is clear from the record that the attorneys were able to interpret A.J.'s occasional nonverbal responses to their questions. A.J. was cooperative with both attorneys and she did not refuse to answer questions, although she no longer remembered very many details of the events. (*Owens*, *supra*, 484 U.S. at pp. 559–560 [opportunity for effective cross-examination not denied by witness's memory loss].) Neither her inability to remember events or details nor her emotional difficulty with the subject matter may be conflated with a refusal to answer questions, although we note that even when a witness narrows the practical scope of cross-examination by refusing to answer questions, the Sixth Amendment is not necessarily violated. (*People v. Homick* (2012) 55 Cal.4th 816, 861, citing *People v. Perez* (2000) 82 Cal.App.4th 760, 766; *Giron-Chamul*, *supra*, 245 Cal.App.4th at pp. 965–966; *People Foalima* (2015) 239 Cal.App.4th 1376, 1392; *People v. Murillo* (2014) 231 Cal.App.4th 448, 455–456.)

Regarding A.J.'s visibility in the camera, she was seated in an office chair looking at a computer monitor with a camera mounted to its top. Defense counsel told A.J. twice he could only see the top of her head. As evidenced by the video, this occurred once when she leaned forward toward the computer monitor and once when she leaned on her hand. She immediately sat up straight and raised her head when defense counsel brought it to her attention and we find these were isolated incidents of no consequence.

Defendant's reliance on *Giron-Chamul* for the proposition that A.J.'s conduct deprived him of his ability to meaningfully cross-examine her is misplaced. In *GironChamul*, the five-year-old victim testified via closed-circuit television for approximately four hours over three days. *(Giron-Chamul*, supra, 245 Cal.App.4th at p. 941.) She spent a significant amount of time out of her chair, either under the conference table or wandering around, and she refused to answer hundreds of questions. (*Id.* at pp. 943–953, 968.)

The Court of Appeal noted "[t]here is a dearth of California authority addressing the circumstances under which a defendant might be denied an adequate opportunity to effectively cross-examine a very young child[,]" but after reviewing several federal and out-of-state decisions, the court concluded that "these decisions suggest a continuum on which the right to an opportunity for effective cross-examination is more likely violated as the number of relevant questions that go unanswered increases. [Citation.] Here, [the victim] refused to answer hundreds of questions, of which approximately 150 were substantive. And nothing about her lack of cooperation can be attributed to the trial court, prosecutor, or defense counsel, all of whom took laudable measures to try to make it easier for her to testify." (*Giron-Chamul*, *supra*, 245 Cal.App.4th at pp. 967–968.)

The victim "refused to respond to many questions that were crucial to testing her claims, particularly those involving her drawing and her report to the day care provider, the forensic interview, and other possible explanations for her apparent sexual knowledge. Nor would she respond to many questions bearing on her credibility more generally, such as follow-up questions about her assertion that [the defendant] had defecated in her hair. We need not determine the exact line on the continuum when a child witness's refusal to answer questions impedes cross-examination enough to violate the confrontation clause because the line was clearly crossed here. [The victim's] failure to respond to questions on critical topics deprived [the defendant] of '"a full and fair opportunity to probe and expose … infirmities"' in her testimony and out-of-court statements [citation], and her testimony should have been stricken." (*Giron-Chamul*, *supra*, 245 Cal.App.4th at pp. 968–969.)

A.J.'s testimony in this case bears no resemblance to that described in *Giron-Chamul*. "The right of confrontation secures to an accused an adequate opportunity to cross-examine adverse witnesses; it does not guarantee testimony free from forgetfulness, confusion, or even evasion." (*People v. Dennis* (1998) 17 Cal.4th 468, 526; accord, *Owens*, *supra*, 484 U.S. at pp. 559–560.) We reiterate that although it was difficult for A.J. to talk about what happened in the basement, she cooperated with both attorneys and her inability to recall events or details does not appear to be attributable to anything other than her age at the time of the crimes and the passage of time.

### b. Support Person's Conduct

Next, defendant claims that A.J.'s support person, Brent, coached and encouraged A.J., and that during the third break in testimony

14

and unbeknownst to defense counsel, A.J. returned to her seat with a drawing on a piece of paper. Defendant contends that Brent's conduct violated his Sixth Amendment rights. Again, we disagree with defendant's characterization of the record.

At the beginning of A.J.'s direct examination, Brent could be heard whispering, "'You're doing great[.]'" The comment occurred during a pause in the examination when the prosecutor inquired about making an adjustment to the camera view and told A.J. to hold on; there was neither a question nor an answer pending. The prosecutor then requested a break in the proceedings to adjust the camera and, during that break, he stated on the record that he heard Brent's comment. Defense counsel agreed and stated that while he understood, Brent could not do that. The trial court thereafter admonished Brent not to communicate with the witness. With defense counsel's agreement, the prosecutor went to the room where A.J. was testifying and told her she could not look at Brent, who was seated behind her and to the side. Brent commented to the prosecutor that she was unaware she had said anything and the issue did not reoccur.

The next two breaks were requested by A.J. when the prosecutor's questions turned to what occurred in the basement. During the final break, A.J. and Brent left the room for water and, when they returned, Brent put a piece of paper down in front of A.J. and told her that if she became scared, all she had to do was look at the paper. A.J. described defendant as a "bad, bad chicken," and appears to read sentences from the paper, such as, "I am not scared of you anymore," "you are super dumb," "you are like a big ball of lava," and "you cannot hurt me." A.J. commented that she wrote the important parts in red and that she would read the paper if she became scared.

Based on our review of the video evidence, it appears that A.J. wrote down her thoughts and feelings on the paper, and it is clear that the paper was intended to be a support tool should she become scared during her testimony. A.J. appears to glance down at the paper at one point during testimony, but she did not read from the paper, hold it up or otherwise appear to rely on it to guide her, and there is no indication the jury saw the paper. A.J. was scared of defendant and it is evident from the video that the purpose of the paper was to give A.J. the strength to testify. Under these circumstances, defendant fails to persuade us that the paper differed materially from the two stuffed animals near her and the pink ball she held, which were also present to provide comfort. Critically, the record fails to support defendant's position that the paper was a "script" created or employed by Brent to somehow coerce or coach A.J., or that it had any impact on the substance of A.J.'s testimony or her demeanor.

Finally, defendant argues that Brent, through her body language, affected the reliability of A.J.'s testimony, but he fails to explain how this was so. After being admonished during the first break in testimony, Brent made no further comments. She occasionally nodded slightly during A.J.'s testimony, but neither the jury nor

15

A.J. could see Brent. After the prosecutor told A.J. during the first break that she could not look at Brent, she did not do so and she kept her eyes on the computer monitor with the camera.

Defendant asserts that Brent was "very visibly pleased" when A.J. incriminated defendant and she "gave an enthusiastic thumbs up" during another part of A.J.'s testimony. As previously discussed, A.J. became visibly withdrawn when the questioning turned to what happened to her in the basement and she requested two breaks before being able to answer the prosecutor's questions about what happened. When A.J. testified to the effect that defendant touched her "'business'" with his "'business'" in the basement, Brent lifted her head up and looked toward the ceiling; and when A.J. testified that she only talked to Brent about what happened in the basement, but "not a lot[,]" Brent moved her right thumb upward. Whether the gestures were conscious or not, Brent's minor movement of her right thumb and her act of lifting her head upward were not visible to A.J. or the jury, and the record simply does not support defendant's claim that Brent coached or otherwise influenced A.J.'s testimony.

Defendant cites *People v. Adams* (1993) 19 Cal.App.4th 412, 438 (*Adams*) for the principle that "[t]he presence of a second person at the stand affects the presentation of demeanor evidence by changing the dynamics of the testimonial experience for the witness." However, neither A.J. nor the jury saw Brent and, as we have explained, there is nothing in the record supporting the claim that Brent conducted herself in a manner that impacted the substance of A.J.'s testimony or her demeanor. While it may be argued that even Brent's mere presence had some effect on the proceedings (*ibid.*), her presence as a support person was authorized by law and cannot, without more, demonstrate a constitutional violation (§§ 868.5, subd. (a), 1347, subd. (f); *Adams*, *supra*, at pp. 441–442; *People v. Chenault* (2014) 227 Cal.App.4th 1503, 1515–1516 [presence of service dog not inherently prejudicial]). Based on the foregoing, we conclude that defendant was not deprived of his right to confront and cross-examine A.J., either by A.J. or by Brent.

C.  Due Process Claim

Defendant also claims that Brent's coaching of A.J. during breaks violated his right to due process and a fair trial. Defendant cites *Adams* and *People v. Patten*, stating the cases "mainly speak to the influence the presence of a support person may have on a jury, but both decisions recognize that there is a danger the support person could also influence the witness's testimony." (*Adams*, *supra*, 19 Cal.App.4th at p. 442 [concluding § 868.5, providing for support persons, is constitutional]; *People v. Patten* (1992) 9 Cal.App.4th 1718, 1732–1733 [finding no due process violation resulting from support person's presence at trial].) In his reply brief, he also additionally cites to the out-of-state decisions in *Sharp v. Commonwealth* (1993) 849 S.W.2d 542 and *State v. Smith* (2009) 383 S.C. 159 for support.

16

1    In *Sharp v. Commonwealth*, a family friend "gestured to the child
2    witness during her testimony and communicated the substance of
     some testimony from the courtroom to one or more separated
     witnesses." (*Sharp v. Commonwealth*, *supra*, 849 S.W.2d at p.
3    547.) The Supreme Court of Kentucky concluded that common
     sense dictated that the family friend's conduct deprived the
4    defendant of a fair trial. (*Ibid.*) The court explained, "Even taking
     [the friend's] version of what she did at face value, the witness
5    received encouragement, approval and comfort at the time her
     credibility was being assessed by the jury. It would be impossible to
6    say that the witness did not derive confidence and assurance from
     this positive reinforcement which influenced the jury to believe her.
7    Whether [the friend's] contact with the separated witnesses affected
     the trial can never be known. After learning that these witnesses
8    had been apprised as to testimony from the courtroom, defense
     counsel did not recall them to the stand." (*Ibid.*)
9
     In *State v. Smith*, the Supreme Court of South Carolina concluded
10   that the trial court properly exercised its authority to grant a new
     trial after finding that conduct by the victim's relative while the
11   victim was testifying deprived the defendant of a fair trial. (*State v.
     Smith*, *supra*, 383 S.C. at pp. 168–169.) In that case, the trial judge
12   found that the victim's relative communicated with him while he
     was testifying, using body language and other nonverbal signals,
13   her conduct "'may have overridden [his] free will'"; and her
     "'behavior and the potential for corruption of [his] testimony
14   clearly denied [the defendant] a fair trial.'" (*Id.* at p. 164.)

15   However, as we have stated, the jury did not see Brent; A.J. did not
     look at Brent while she testified; and the record does not support
16   defendant's contention that Brent coached A.J.'s testimony,
     verbally or nonverbally. As such, defendant fails to show a due
17   process violation. (*People v. Myles* (2012) 53 Cal.4th 1181, 1214
     [absent improper interference, a support person's mere presence
18   does not infringe on due process and confrontation clause rights];
     *People v. Spence* (2012) 212 Cal.App.4th 478, 514 ["It is
19   established that a support person's mere presence with a witness on
     the stand, pursuant to section 868.5, does not infringe upon a
20   defendant's due process and confrontation clause rights, unless the
     support person improperly interferes with the witness's testimony,
21   so as to adversely influence the jury's ability to assess the
     testimony."]; accord, *People v. Valenti* (2016) 243 Cal.App.4th
22   1140, 1171; see *People v. Lopez* (2018) 5 Cal.5th 339, 354
     [rejecting due process claim based on argument that "'children are
23   highly susceptible to suggestive questioning techniques like
     repetition, guided imagery, and selective reinforcement'"]; *People
24   v. Chenault*, *supra*, 227 Cal. App.4th at pp. 1515–1516 [rejecting
     claim that presence of support dog violated the defendant's right to
25   a fair trial].)

26   (Doc. No. 21-19 at 10-34).
27
               **2.    Analysis – Confrontation Claim**
28
                                    17

1    The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the

2  right to confront and cross-examine witnesses against him.  *Pennsylvania v. Ritchie*, 48 U.S. 39,

3  51 (1987); *United States v. Owens*, 484 U.S. 554, 559 (1987).  The purpose of the Confrontation

4  Clause is to "ensure the reliability of the evidence against a criminal defendant by subjecting it to

5  rigorous testing in the context of an adversary proceeding before the trier of fact."  *Maryland v.*

6  *Craig*, 497 U.S. 836, 845 (1990).  The Confrontation Clause, however, does not guarantee that

7  "every witness called by the prosecution will refrain from giving testimony that is marred by

8  forgetfulness, confusion, or evasion."  *Delaware v. Fensterer*, 474 U.S. 15, 21 (1985).  It is

9  "generally satisfied when the defense is given a full and fair opportunity to probe and expose

10  these infirmities through cross-examination, thereby calling to the attention of the factfinder the

11  reasons for giving weight to the witness' testimony."  *Id*. at 21-11; *see also Delaware v. Van*

12  *Arsdall*, 475 U.S. 673, 679 (1986) (the Constitution only "guarantees an opportunity for cross-

13  examination, not cross-examination that is effective in whatever way, and to whatever extent, the

14  defense might wish") (internal quotation and citation omitted).

15    In considering Petitioner's confrontation claim, the state court correctly identified

16  *Maryland v. Craig* and *United States v. Owens* as governing federal law.  In analyzing

17  Petitioner's claims, the state court viewed A.J.'s videotaped testimony.  With regards to

18  Petitioner's claim that the child-victim refused to answer questions, the state court found the

19  video evidence revealed that A.J. responded to questions from both the prosecutor and defense

20  attorney, albeit some of her responses were non-verbal, *i.e*. she nodded her head or shrugged her

21  shoulders.  The state court found A.J.'s demeanor "somber" noting she "visually shrank down in

22  her seat" when questioned about the molestation.  With regards to Petitioner's claim the child

23  victim was not visible on the screen; the state court found the video revealed that the jury was

24  able to observe A.J.'s demeanor except in  two "isolated incidents" when she was leaning and

25  only the top of her head was viewable.  Further, the state court noted that defense counsel

26  remedied the situation by asking A.J. to sit upright, which she immediately did.  The state court

27  found no evidence to corroborate Petitioner's claim that A.J. testified from a script prepared by

28  her support person.  Instead, the state court concluded that A.J. created the paper and used it as a

1   comfort device if she became scared, similar to her pink ball and stuffed animals, and she did not

2   read from or show the paper to the jury.  Finally, the state court found no evidence that A.J.

3   looked at her support person while testifying belying any claim that A.J. was influenced by the

4   support person's demeanor or gestures.  A noted by the state court, the jury could not see A.J.'s

5   support person on screen during A.J.'s testimony which further undercut Petitioner's allegation

6   that the support person's presence affected the jury's perception of the proceedings.

7          The record supports the findings made by the state court and Petitioner otherwise does not

8   demonstrate that the factual findings by the state court are not otherwise supported by the record.

9   The undersigned finds that the state court's determination that constitutional requirements of

10  physical presence, oath, cross-examination, and observation of demeanor by the trier of fact were

11  satisfied during A.J.'s testimony and rejection of Petitioner's Confrontation Clause claim was not

12  contrary to, or an unreasonable application of, clearly established federal law, nor was it based on

13  an unreasonable determination of the facts in light of the evidence presented in the state court

14  proceeding.  Thus, the undersigned recommends that Petitioner's Sixth Amendment

15  Confrontation Claim be denied.

16              **2.  Analysis -Coaching Claim**

17         Petitioner claims that the presence of the support person influenced A.J.'s testimony

18  which deprived him of a fair trial.  Specifically, Petitioner states the support person coached A.J.

19  during a break, instructed A.J. to refer to a paper during her testimony that characterized

20  Petitioner "as bad."  (Doc. No. 1 at 29-31).  Further, Petitioner claims the support person sighed

21  heavily or made comments during A.J. s testimony.  (*Id*.).

22         Under California law, a complaining witness in a prosecution for sexual assault may be

23  accompanied by a witness advocate.  Pen. Code, § 868.5, subd. (a).  The state court did find the

24  support person was heard whispering once "You're doing great" during a pause in the

25  examination, looked up toward the ceiling at one point, and raised a finger at another point, but

26  otherwise rejected the factual predicate of Petitioner's Due Process claims, finding "the record

27  does not support [Petitioner's] contention that [A.J.'s support person] coached A.J.'s testimony,

28  verbally or nonverbally."  (Doc. No. 21-19 at 16).  However, the state court noted that after the

1    remark, the court admonished the support person not to communicate with A.J., and the issue did

2    not reoccur.  Otherwise, the support person was located behind A.J. so any gestures would not

3    have been seen by A.J.  Further, the support person was not visible to the jury.

4         In *Carey v. Musladin*, 549 U.S. 70, 76 (2006), the United States Supreme Court stated that

5    the effect of private-actor spectator conduct on a defendant's right to a fair trial was "an open

6    question in our jurisprudence."  The undersigned has located no Supreme Court case addressing

7    whether a defendant's due process rights are violated when a child-victim testifies in the presence

8    of a support person.  Without such authority, a federal habeas court cannot find that the state

9    court's rejection of the merits of a petitioner's claim was either contrary to or involved an

10   unreasonable application of clearly established Supreme Court law for purposes of § 2254(d)(1).

11   *Harrington v. Richter*, 562 U.S. at 101 ("[I]t is not an unreasonable application of clearly

12   established Federal law for a state court to decline to apply a specific legal rule that has not been

13   squarely established by this Court.").

14        Nonetheless, the undersigned finds that the state court's rejection of this claim as lacking a

15   factual foundation was not based on an unreasonable determination of the facts in light of the

16   evidence presented in the State court proceeding.  Thus, the undersigned recommends that

17   Petitioner's claim that the support person influenced A.J. in violation of hiss Due Process rights

18   should be denied.

19               **B.  Ground 3:  A.J.'s Prior Statements to Rios and Her Mother**

20        In his third ground for relief, Petitioner contends that A.J.'s statements to and videotaped

21   interview with Detective Rios and A.J.'s statement to her mother were improperly admitted into

22   evidence in violation of the Confrontation Clause of the Sixth Amendment.  (Doc. No. 1 at 31).

23   Specifically, Petitioner argues that the trial court abused its discretion in finding that A.J.'s

24   statement to her mother and Detective Rios were reliable within the  meaning of California

25   Evidence Code section 1360 because A.J. was not subject to meaningful cross-examination.  (*Id*.

26   at 31-32).  Further, Petitioner claims that A.J.'s statement to Detective Rios were unreliable.  (*Id*.

27   at 33-37).

28               **1.  State Court Decision**

20

1    Petitioner raised this ground on direct appeal.  (Doc. No. 21-14 at 40-49).  The Fifth

2   Appellate District Court denied these grounds on the merits.  (Doc. No. 21-19 at 19-25).  The

3   California Supreme Court summarily denied any relief.  (Doc. No. 21-24).  Respondent argues

4   the state court's opinion rejecting these claims was not contrary to or an unreasonable application

5   of clearly established Supreme Court precedent.  (Doc. No. 20 at 20, 27).  The Court considers

6   the last state court reasoned decision in denying Petitioner relief on this claim.

7    II. Admissibility of A.J.'s Prior Statements

8    A.  Background

9    Pursuant to Evidence Code section 1360 and over defense counsel's
     objection that A.J. was not a competent trial witness and that her
10   statements were not reliable, the trial court admitted A.J.'s
     statements to B.L. and Detective Rios, and her videotaped interview
11   with Rios. Evidence Code "[s]ection 1360 creates a limited
     exception to the hearsay rule in criminal prosecutions for a child's
12   statements describing acts of child abuse or neglect, including
     statements describing sexual abuse." (*People v. Roberto V*. (2001)
13   93 Cal.App.4th 1350, 1367 (*Roberto V*.).) The statute requires
     "that: (1) the court find, in a hearing conducted outside the presence
14   of the jury, that the time, content, and circumstances surrounding
     the statement(s) provide sufficient indicia of reliability; (2) the child
15   either testifies at the proceedings, or, if the child is unavailable to
     testify, other evidence corroborates the out-of-court statements; and
16   (3) the proponent of the statement gives notice to the adverse party
     sufficiently in advance of the proceeding to provide him or her with
17   a fair opportunity to defend against the statement." (*Ibid*., fn.
     omitted; accord, *People v. Brodit* (1998) 61 Cal.App.4th 1312,
18   1329 (*Brodit*).)

19   On appeal, defendant claims the trial court erred in admitting the
     statements and video because A.J. was not subject to cross-
20   examination, in violation of his Sixth Amendment rights, and her
     statements were unreliable. The People disagree. As discussed in
21   the preceding section, defendant was not deprived of his Sixth
     Amendment right to cross-examine A.J. at trial and, therefore, that
22   portion of his argument has been resolved against him. As we shall
     explain, we also resolve his argument that the statements were
23   unreliable against him.

24   B.  Standard of Review

25   We review a trial court's ruling on the admission or exclusion of
     evidence for abuse of discretion. (*People v. Kopatz* (2015) 61
26   Cal.4th 62, 85; accord, *People v. DeHoyos* (2013) 57 Cal.4th 79,
     131; *People v. Mitchell* (2020) 46 Cal.App.5th 919, 927 [Evid.
27   Code, § 1360]; *Roberto V*., supra, 93 Cal.App.4th at p. 1367
     [same].) "Under this standard, a trial court's ruling will not be
28   disturbed, and reversal of the judgment is not required, unless the

21

trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

C.   Analysis

In sexual abuse cases, factors relevant in determining whether a child's statements are reliable's include: "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate." (*In re Cindy L.* (1997) 17 Cal.4th 15, 30 (*Cindy L.*), citing *Idaho v. Wright* (1990) 497 U.S. 805, 821–822 (*Wright*); accord, *Roberto V., supra*, 93 Cal.App.4th at p. 1374; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 445 (*Eccleston*); *Brodit, supra*, 61 Cal.App.4th at p. 1330.) Although not dispositive of the matter, "ability to understand the duty to tell the truth and to distinguish between truth and falsity is also a factor in determining the reliability of [a child's] extrajudicial statements." (*Cindy L.*, supra, at p. 30; accord, *Brodit*, supra, at p. 1330.)

    1.   A.J.'s Statements to B.L.

On the evening of June 11, 2013, A.J. disclosed to her grandmother, R.J., that defendant had her lick candy off his "business." A.J. was fearful and asked R.J. to promise she would not tell. The next morning, R.J. informed B.L. that A.J. said defendant had done some things to A.J. B.L. questioned A.J., who expressed fear she would get in trouble and her playhouse would be torn down. After B.L. "pinky promised" she would not tell and A.J. would not get in trouble, A.J. disclosed that defendant was licking candy from her "'business'" and having her lick candy from his "'business'" and that it hurt.

Defendant argues that A.J.'s statements to her mother were not reliable given her age and the fact that her grandmother had questioned her the night before. We disagree. Defendant cites no authority for his position, which is contrary to established law. If mere age and the fact that a disclosure was repeated to more than one person were sufficient to preclude the admission of statements under Evidence Code section 1360, the hurdle would be virtually insurmountable in sexual abuse cases involving young children. Instead, the determination requires consideration of "the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." (*Wright*, supra, 497 U.S. at p. 820; accord, *Cindy L.*, supra, 17 Cal.4th at pp. 29–30.)

A.J.'s disclosure to her grandmother that defendant had her lick candy off his "business" was spontaneous, and R.J. testified that she was "flabbergasted" and did not question A.J. A.J.'s disclosure to her mother the next morning was consistent with this prior,

22

spontaneous disclosure to her grandmother. (*Cindy L.*, supra, 17 Cal.4th at p. 35; *Eccleston*, supra, 89 Cal.App.4th at p. 446; *Brodit*, supra, 61 Cal.App.4th at p. 1330.) Nothing in the record suggests A.J.'s mental state rendered the statements unreliable (*Brodit*, supra, at p. 1330), and there is no evidence suggesting A.J. had any motive to lie (*Cindy L.*, supra, at p. 35; *In re Daniel W.* (2003) 106 Cal.App.4th 159, 165 (*Daniel W.*); *Roberto V.*, supra, 93 Cal.App.4th at pp. 1374–1375; *Eccleston*, supra, at p. 448; *Brodit*, supra, at p. 1330). Although at trial more than three years later, A.J. testified she did not like defendant, neither R.J. nor B.L. observed anything amiss with respect to defendant and his relationship with B.L.'s children prior to the disclosure of abuse. B.L. testified that they took trips together as a family, defendant had a "[r]eally good" relationship with the children, A.J. was "very happy" with him, he played with A.J. and her younger brother, and he had a parental-like role in the household.

With respect to age-appropriate terminology or knowledge, the evidence established that in A.J.'s family, the term "business" meant private parts, or genitalia. While that term was not age inappropriate, the act of licking candy off of genitalia certainly evidences knowledge of a sexual act beyond the expected awareness of a normal four-year-old child. (*Daniel W.*, supra, 106 Cal.App.4th at pp. 165–166; *Roberto V.*, supra, 93 Cal.App.4th at p. 1375; *Eccleston*, supra, 89 Cal.App.4th at p. 447; *Brodit*, supra, 61 Cal.App.4th at p. 1330.) Finally, the social worker established A.J.'s ability to distinguish between the truth and a lie during her first and her second MDIC interview, the first of which occurred less than a week after her disclosure of abuse to B.L. Accordingly, in view of the totality of the circumstances, we find no error in the determination that A.J.'s statements to B.L. were reliable and therefore admissible under Evidence Code section 1360. (Wright, supra, 497 U.S. at p. 820; accord, *Cindy L.*, supra, 17 Cal.4th at pp. 29–30.)

    2.   A.J.'s Statements to Rios

After B.L. contacted the police on June 12, 2013, A.J. was interviewed by a social worker on June 17, 2013. She appeared happy until questioned about defendant, at which time she hid her face and said, "'I don't want to talk about it. I don't want to tell you.'" On June 20, 2013, she was again interviewed by the social worker and when the subject turned to defendant, she hid her face and said, "'I can't do it[.]'" Detective Rios, who had years of experience investigating sexual assault cases and had specialized training in the subject, testified that she told the family to contact her when A.J. was ready to talk and she did so because she believed, based on her background, that A.J. was afraid to talk about what happened as opposed to having nothing to disclose. A.J. was subsequently interviewed for a third time on June 28, 2013.

During the third interview, which was conducted by Detective Rios, A.J. again disclosed that defendant put candy on his "business" and had her lick it, consistent with her spontaneous disclosure to R.J. and her subsequent disclosure to B.L. As with A.J.'s statements to

B.L., nothing in the record suggests the statements were unreliable due to an issue with her mental state, she had no motive to lie and describing the act of licking candy from genitalia is unexpected from a four year old child. Further, the interview with Detective Rios was mere weeks after A.J.'s initial disclosure to R.J. Under these circumstances, we also conclude that the trial court did not err in finding A.J.'s statements to Rios reliable and admissible under Evidence Code section 1360.

Defendant's contrary arguments are unpersuasive. Defendant faults Rios for not establishing that A.J. knew the difference between the truth and a lie or that "she understood terms such as over or under or inside or outside[.]" He also asserts that A.J. had trouble with numbers. These contentions are untenable.

Notwithstanding that Evidence Code section 1360 does not mandate an affirmative showing on either point, the social worker who conducted A.J.'s first two MDIC interviews established that A.J. knew the difference between the truth and a lie and established that she grasped certain terms and concepts. Defendant offers no explanation why the failure to cover this territory during a third interview that occurred only a week later is of any significance. As for the concept of numbers, A.J. demonstrated she was able to count crayons, which we believe is all that may be reasonably expected from a four-year-old in preschool.

We decline defendant's invitation to sift through A.J.'s third interview and identify every statement that might, in isolation, suggest oddness or fancy, and Rios was not required to delve deeper into every statement made by A.J. It does not strike us as unusual, for example, that a four-year-old might not know Rios's name and while we cannot discern from the record what A.J. meant when she was talking about broken bones, her reference to being in college when asked about her teacher is understandable given that she attended preschool at Merced College while her mother attended classes there.

Defendant also contends that A.J. did not disclose any abuse in her first two MDIC interviews or in the CPS interview that preceded the initial disclosure to R.J. As discussed, A.J. refused to discuss defendant or what she told her grandmother in her first two MDIC interviews, but Rios believed this was fear-driven rather than a function of having no information to disclose. As for the CPS interview, that occurred pre-disclosure and the exact date the abuse began is unclear. That interview may or may not have preceded the initiation of the molestations but, regardless, A.J.'s nondisclosure at that time to a stranger is entirely consistent with her post disclosure conduct: the fear she displayed when discussing the issue even with her grandmother and mother, whom she loved and trusted, and her refusal to discuss the issue in her first two MDIC interviews.

Finally, defendant relies on *State v. Michaels* (1994) 136 N.J. 299 for the proposition that Rios's interview of A.J. was "so suggestive that it created a substantial risk that the statements elicited lacked

24

sufficient reliability to justify their admission at trial." We find *State v. Michaels* inapt.

In that case, the Appellate Division reversed, on several grounds, the convictions of "a nursery schoolteacher … convicted of bizarre acts of sexual abuse against many of the children who had been entrusted to her care." (*State v. Michaels*, supra, 136 N.J. at p. 303.) The state sought review (*ibid.*), and the New Jersey Supreme Court addressed the issue concerning the propriety of assessing reliability as a predicate to the admission of in-court testimony (*id.* at p. 316). The court concluded that a pretrial taint hearing was required should the prosecutor elect to retry the case and affirmed the Appellate Division's judgment, observing, "The interrogations undertaken in the course of this case utilized most, if not all, of the practices that are disfavored or condemned by experts, law enforcement authorities and government agencies[]" (*id.* at p. 313), including "the absence of spontaneous recall, interviewer bias, repeated leading questions, multiple interviews, incessant questioning, vilification of [the] defendant, ongoing contact with peers and references to their statements, and the use of threats, bribes and cajoling, as well as the failure to videotape or otherwise document the initial interview sessions" (*id.* at p. 321).

We have reviewed the videotaped interview in its entirety and no such circumstances even arguably occurred in this case. Detective Rios interviewed A.J. on the substance of her molestation only once and the interview lasted only 32 minutes, approximately. A.J. clearly had spontaneous recall of the relevant events, including the use of red candy that her mother kept hidden on the dresser and that defendant had her lick the candy off "his business." A.J. stated she told her grandmother and mother about what happened; Rios's demeanor was relaxed and friendly; and Rios did not threaten, bribe or cajole A.J. into making any allegations of molestation.

Additionally, we note that in *Wright*, discussed in the preceding subsection, the complaining witness, who was only two years old at the time of the alleged crimes, was interviewed by a pediatrician who asked blatantly leading questions such as, " "Does daddy touch you with his pee-pee[?]' " (*Wright*, supra, 497 U.S. at p. 811.) The United States Supreme Court agreed with the Idaho Supreme Court that the doctor's questioning of the child was troubling. (*Id.* at pp. 826–827.) Here, in contrast, Detective Rios did not engage in this type of questioning. A.J., for example, spontaneously asked at the outset if Rios was going to take defendant to jail because "he did it to down here," and Rios had her point out what she meant on a diagram. Rios also asked A.J questions such as, "Did someone touch you there? Yeah. Who touched you there?" Accordingly, we find defendant's reliance on *State v. Michaels* misplaced given the facts of this case and we find no error in the admission of A.J.'s statement to Detective Rios.

## 2. Analysis as to Ground 3- A.J.'s Prior Statements

The state court addressed the admissibility of this evidence primarily in terms of the

25

relevant provision of California law,[5] but noted the applicable Supreme Court governing law as set forth in *Idaho v. Wright*, 497 U.S. 805 (1990) in rejecting Petitioner's claim. In *Wright*, the Supreme Court stated that "[t]he state and federal courts have identified a number of factors that we think properly relate to whether hearsay statements made by a child witness in child sexual abuse cases are reliable." 497 U.S. at 821. These include spontaneity, consistent repetition, the mental state of the declarant, the use of terminology unexpected of a child of similar age, and lack of motive to fabricate. *Id*. at 821-22. The Court held that these factors "apply to whether such statements bear 'particularized guarantees of trustworthiness' under the confrontation Clause." *Id*. at 822.

The state court concluded that A.J.'s prior statements to her mother and Detective Rios describing the sexual abuse had the necessary indicia of reliability as required under California evidence law and as a constitutional requirement. Notably, A.J. did testify during the trial, and was subject to meaningful cross-examination. Further, the state court methodically analyzed each of the factors in assessing reliability as approved by the Supreme Court in *Wright*. The undersigned finds that the state court's rejection of this ground was not objectively unreasonable

---

[5] California Evidence Code section 1360, in relevant part provides:

(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:

(1) The statement is not otherwise admissible by statute or court rule.

(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

(3) The child either:

(A) Testifies at the proceedings.

(B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child.

conclusion nor based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Thus, the undersigned recommends that Ground Three be denied as without merit.

### C. Ground 4 – Prison Letter

In his fourth ground Petitioner contends that the trial court erred in permitting into evidence his letter and jailhouse calls as consciousness of guilt, "which revealed a plan to commit arson and kill the complaining witness and her family," because they were irrelevant and inflammatory and rendered his trial fundamentally unfair.  (Doc. No. 1 at 38-40).  Petitioner challenged the trial court's admission of this evidence on direct appeal.  (Doc. No. 21-14 at 49-52).  The Fifth Appellate District Court denied this ground on the merits.  (Doc. No. 21-19 at 25-28).  The California Supreme Court summarily denied any relief.  (Doc. No. 21-24).  Respondent argues the state court's rejection of Petitioner's claim did contravene or unreasonably apply any Supreme Court holding.  (Doc. No. 20 at 38).  The Court looks through to the last state court reasoned decision in evaluating Petitioner's claim under the deferential standard of review. *Wilson v. Sellers*, 138 S. Ct. at 1192.

### 1. State Court Decision

III. Consciousness of Guilt Evidence

A. Background

Prior to trial, the court held a hearing to determine the admissibility of the jailhouse letter written by defendant and, during trial, it held a hearing to determine the admissibility of the four jailhouse calls. The prosecutor sought to introduce the letter and the calls on the ground that they were relevant to defendant's consciousness of guilt. Defense counsel objected on grounds of foundation, relevance and undue prejudice under Evidence Code section 352. The trial court overruled the objections and admitted the evidence.

On appeal, defendant claims that the probative value of the evidence was substantially outweighed by the danger of undue prejudice and the trial court erred in concluding otherwise. (Evid. Code, § 352.) We agree with the People that the trial court did not abuse its discretion in admitting the evidence.

B. Admission of Evidence Under Evidence Code Section 352

1. Legal Standard

27

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action[,]" (Evid. Code, § 210), and, under California law, all relevant evidence is admissible except as otherwise provided by statute (Evid. Code, § 351). Of pertinence here, Evidence Code section 352 limits the admission of relevant evidence as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

However, "[p]rejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of undue prejudice. Unless the dangers of undue prejudice, confusion, or time consumption "'substantially outweigh'" the probative value of relevant evidence, a section 352 objection should fail. [Citation.]  The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging.'" [Citation.]" [Citation.] [¶] The prejudice that section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'" (*People v. Doolin*, *supra*, 45 Cal.4th at pp. 438–439; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105; accord, *People v. Tran* (2011) 51 Cal.4th 1040, 1048.)

2. Standard of Review

On appeal, we presume the trial court's evidentiary ruling is correct and defendant bears the burden of demonstrating error. (*People v. Giordano* (2007) 42 Cal.4th 644, 666; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139–1140.) "The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence." (*People v. Clark* (2016) 63 Cal.4th 522, 572; accord, *People v. Jackson* (2016) 1 Cal.5th 269, 320.) We review the court's ruling for abuse of discretion. (*People v. Clark*, *supra*, at p.

572; accord, *People v. Johnson* (2019) 8 Cal.5th 475, 521; *People v. Jackson*, *supra*, at p. 321.)

3. Analysis

Defendant acknowledges that efforts to suppress testimony may indicate consciousness of guilt, but contends it may also merely indicate anger at being falsely accused of a crime carrying a sentence of life in prison, thereby diminishing the probative value of the evidence. As defendant correctly concedes, evidence that he planned to have A.J. and her family killed prior to trial was relevant to consciousness of guilt, which "is generally admissible within the trial court's discretion." (*People v. Anderson* (2018) 5 Cal.5th 372, 391; accord, *People v. Jones* (2017) 3 Cal.5th 583, 609–610; *People v. Valdez* (2012) 55 Cal.4th 82, 135, fn. 32; *People v. Johnson* (1992) 3 Cal.4th 1183, 1235; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1246; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1007.) In this case, the prosecutor argued that the evidence demonstrated defendant's consciousness of guilt while defense counsel argued that the letter, written more than two years after defendant's arrest, had nothing to do with the alleged crimes and instead detailed "a completely farcical and outrageous plan" that was the act of a frustrated, hopeless man, but not a guilty man. However, the existence of these competing inferences did not undermine the probative value of the evidence; it was for the jury to decide what inferences to draw. (*People v. Anderson*, *supra*, at pp. 391–392; *People v. Jones*, *supra*, at p. 610.)

With respect to prejudice, while the evidence was certainly damaging to defendant, that is not the test. "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Jones*, *supra*, 3 Cal.5th at p. 610.) The evidence here, however repugnant, was nonetheless confined to an unexecuted plan, and we are not persuaded that it was misleading, confusing or so inflammatory that it should have been excluded under Evidence Code section 352. We find no error. (*People v. Jones*, *supra*, at p. 610.)

(Doc. No. 21-19 at 25-28).

**2.  Analysis**

Recently, the Supreme Court  made clear that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Andrew v. White*, No. 23-6573, 2025 WL 247502, at *1 (U.S. Jan. 21, 2025) (quoting *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *see also*, *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief unless it rendered the trial

1  fundamentally unfair in violation of due process.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68

2  (1991).  To obtain relief on an evidentiary ruling, the petitioner must show that the error was of a

3  constitutional dimension and that it was not harmless.  *Brecht v. Abrahamson*, 507 U.S. 619

4  (1993).  This requires the error to have had "'a substantial and injurious effect' on the verdict."

5  *Id*. at 623.

6        Under Ninth Circuit precedent, the admission of evidence can violate the constitution

7  "only when there are *no* permissible inferences the jury may draw from the evidence." *Windham*

8  *v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (original emphasis; citation and internal

9  quotations omitted).  Here, the jury could draw from the jail letter and telephone calls a

10 permissible inference of Petitioner's consciousness of guilt.  *See People v. Williams*, 16 Cal. 4th

11 153, 201, 66 Cal. Rptr. 2d 123, 940 P.2d 710 (1997), *cert. denied*, 522 U.S. 1150 (1998)

12 ("evidence of attempts to suppress evidence [is] relevant to show consciousness of guilt.")

13 (citation omitted).

14       Even without the introduction of Petitioner's jail letter, the evidence against him remained

15 very strong.  A.J. had spontaneously disclosed Petitioner's sexual abuse to her grandmother.  A.J.

16 confirmed the abuse to her mother and to Detective Rios.  There was physical evidence to

17 corroborate A.J.'s statements.  Her dress was found hidden amongst Petitioner's property and it

18 had Petitioner's semen on it.   A small bottle of red-flavored lubricant as described by Petitioner

19 was located in a box on her mother's dresser which A.J. explained was the location of the candy

20 Petitioner used during the sexual abuse.  Further, the trial court instructed the jury that both flight

21 and consciousness of guilt evidence cannot prove guilt by itself, thereby mitigating any

22 prejudicial impact of the jail letter or telephone calls.  (Doc. No. 21-9 at 204-205).

23       The undersigned finds that the state court rejection of this ground was not contrary to, or

24 an unreasonable application of, clearly established federal law, nor was it based on an

25 unreasonable determination of the facts in light of the evidence presented in the State court

26 proceeding. Further, on this record, any error in admitting the evidence did not render Petitioner's

27 trial fundamentally unfair as to deprive him of due process.  Thus, the undersigned recommends

28 the district court deny Petitioner relief on Ground Four.

1          **D.  Grounds 5, 6, 7: Restitution Issue**

2          Each of Petitioner's remaining grounds challenge the restitution fine imposed by the trial

3    court.  In his fifth ground, Petitioner contends that the trial court erred by imposing restitution and

4    parole revocation fine and court operations assessments without considering Petitioner's ability to

5    pay.  (Doc. No. 1 at 40-41).  In his sixth ground, Petitioner asks this federal habeas court to grant

6    habeas corpus relief to resolve a purported conflict between the districts of the California Court of

7    Appeal concerning his restitution claim.  Specifically, Petitioner argues the trial court ordered him

8    to pay victim restitution in the amount of $1,440 without "substantial evidence to support" the

9    amount of the order.  (Doc. No. 1 at 42- 44).  After Petitioner challenged the restitution order on

10   direct appeal, the California appellate court concluded that he forfeited his sufficiency of the

11   evidence claim.  (Doc. No. 21-32 at 4.)  Petitioner argues that this Court should grant habeas

12   corpus relief because "[t]here is now a split of authority in the [California] Courts of Appeal

13   regarding whether an objection is required to preserve a claim of sufficiency of the evidence to

14   support a restitution award."  (Doc. No. 1 at 44.)  In his final seventh ground for relief, Petitioner

15   asks this federal habeas court to vacate his restitution order because he was absent from the

16   restitution hearing.  (Doc. No. 1 at 44).  Respondent submits that habeas relief is unavailable for

17   each of these claims because they are not cognizable on federal habeas review.  (Doc. No. 20 at

18   40-42).  The undersigned agrees.

19         Specifically, as claims challenging restitution orders or fines do not affect a petitioner's

20   fact or duration of confinement, such claims are not cognizable on habeas review.  *See Bailey v.*

21   *Hill*, 599 F.3d 976, 989 (9th Cir. 2010) (finding no jurisdiction over in-custody petition raising a

22   challenge to restitution order); *United States v. Gianelli*, 543 F.3d 1178, 1184 n. 7 (9th Cir. 2008)

23   (fining no jurisdiction where petitioner is not seeking release from custody and "review of

24   restitution order is not properly brought in habeas petition.") (citations omitted); *Williamson v.*

25   *Gregoire*, 151 F.3d 1180, 1183 (9th Cir. 1998) ("[C]ourts hold that the imposition of a fine . . . is

26   merely a collateral consequence of conviction and does not meet the 'in custody' requirement"

27   for federal habeas relief.).

28         Moreover, the fact that Petitioner may challenge his conviction on other grounds, "does

31

1    not create jurisdiction to review the fine." *Tuggle v. Campbell*, 261 F. App'x 56, 58 (9th Cir.

2    2007); *see also United States v. Thiele*, 314 F. 3d 399, 401 (9th Cir. 2002) (noting "cognizable

3    claims in a § 2255 motion do not run interference for non-cognizable claims" and '[n]on

4    cognizable claims do not morph into cognizable ones by osmosis."); *Gutierrez v. Groves*, 2017

5    WL 840655, at *62 (E.D. Cal. Mar. 3, 2017), findings and recommendations adopted, 1:14-cv-

6    1753 AWI-JLT (E.D. Cal. May 10, 2017) ("Petitioner is not in custody pursuant to a restitution

7    fine; therefore, a challenge to the restitution fine has no effect on Petitioner's custody.").  Thus,

8    even if the Court were to grant relief on any of these remaining grounds, it would not affect the

9    fact or duration of Petitioner's confinement.  Consequently, the undersigned recommends that

10    Grounds Five, Six and Seven be dismissed for failing to state a cognizable federal habeas claim.

11        **V.  CERTIFICATE OF APPEALABIILTY**

12          A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

13    court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

14    *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

15    district court to issue or deny a certificate of appealability when entering a final order adverse to a

16    petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

17    Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

18    showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

19    the petitioner to show that "jurists of reason could disagree with the district court's resolution of

20    his constitutional claims or that jurists could conclude the issues presented are adequate to

21    deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.

22    McDaniel*, 529 U.S. 473, 484 (2000).  Because the petitioner has not made a substantial showing

23    of the denial of a constitutional right, the undersigned recommends that the court decline to issue

24    a certificate of appealability.

25          Accordingly, it is **RECOMMENDED**:

26        1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

27            1); and

28        2.  Petitioner be denied a certificate of appealability.

1

**NOTICE TO PARTIES**

2          These Findings and Recommendations will be submitted to the United States District

3   Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

4   after being served with a copy of these Findings and Recommendations, a party may file written

5   objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

6   "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

7   **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

8   wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

9   CM/ECF document and page number, when possible, or otherwise reference the exhibit with

10  specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

11  the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

12  636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

13  waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

14

15  Dated:    __February 12, 2025__

16                                                      HELENA M. BARCH-KUCHTA
                                                        UNITED STATES MAGISTRATE JUDGE
17

18

19

20

21

22

23

24

25

26

27

28